NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241282-U

NO. 4-24-1282

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 1, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ILLINOIS BAPTIST STATE ASSOCIATION, an Illinois Not-for-Profit Corporation, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) | Sangamon County |
| v. | ) | No. 20MR325 |
| THE DEPARTMENT OF INSURANCE, | ) | |
| Defendant-Appellee. | ) | Honorable |
| | ) | Christopher G. Perrin, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Steigmann and Vancil concurred in the judgment.
Justice Steigmann also specially concurred.

**ORDER**

¶ 1    *Held*:    The trial court did not err by granting defendant's motion for summary judgment on plaintiff's claim the Illinois abortion insurance coverage mandate violated the Illinois Religious Freedom Restoration Act because plaintiff's religious beliefs were not substantially burdened by the mandate.

¶ 2    On May 17, 2024, plaintiff, the Illinois Baptist State Association (Association), and defendant, the Department of Insurance (Department), filed cross-motions for summary judgment on the Association's claim the abortion insurance coverage mandate (mandate) found in section 356z.4a of the Illinois Insurance Code (215 ILCS 5/356z.4a (West 2020)), which was enacted as part of the Reproductive Health Act (Pub. Act 101-13 (eff. Jun. 12, 2019)), violated the Illinois Religious Freedom Restoration Act (IRFRA) (775 ILCS 35/1 to 99 (West 2020)). On September 4, 2024, the trial court granted the Department's motion for summary judgment, ruling the mandate did not substantially burden the Association's religious beliefs. The Association appeals, arguing

the mandate violates its rights under the IRFRA by coercing the Association to provide abortion coverage to its employees. We affirm.

¶ 3                                                  I. BACKGROUND

¶ 4        On June 10, 2020, the Association, along with two other corporations (Southland Smiles, Ltd., and Rock River Cartage, Inc.) and the respective owners of those two corporations (Dr. Richard Mantoan and Curt House), filed a two-count complaint for declaratory and injunctive relief against the Department and the Department's director, Robert Muriel, both in his individual and official capacity. The complaint sought judicial review of the mandate, which states, in part:

> "(a) Except as otherwise provided in this Section, no individual or group policy of accident and health insurance that provides pregnancy-related benefits may be issued, amended, delivered, or renewed in this State after the effective date of this amendatory Act of the 101st General Assembly unless the policy provides a covered person with coverage for abortion care." 215 ILCS 5/356z.4a (West 2020).

Plaintiffs alleged the mandate violated their rights under the IRFRA and the Health Care Right of Conscience Act (Conscience Act) (745 ILCS 70/1 to 14 (West 2020)).

¶ 5        The Association alleged it had a sincere religious belief abortion is gravely wrong and sinful because it involves the destruction of human life. Further, the Association alleged it "cannot facilitate access to, subsidize, or otherwise materially cooperate with the provision of abortion without violating their conscience and most sacred and solemn obligations to God, betraying their professed religious faith, and disserving the best interests of their fellow human beings."

¶ 6        According to the Association, it provided health insurance coverage, including pregnancy-related benefits, to more than 20 employees through a third-party insurer prior to the

- 2 -

enactment of the Reproductive Health Act. The Association alleged it had a religious and moral duty to provide health insurance to its employees and wanted to continue providing this coverage but did not want to provide insurance coverage for abortions or other products and services that violated its religious beliefs. However, because of the mandate, the Association claimed the Department was coercing the Association to violate its religious beliefs by requiring abortion coverage in the health insurance policy the Association purchased.

¶ 7        On September 8, 2020, defendants filed a motion to dismiss the complaint pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2020)). Defendants argued plaintiffs lacked standing and the claims against Director Muriel in his individual capacity were barred by common law public official immunity. In addition, defendants argued plaintiffs failed to state a claim for relief under the IRFRA and the Conscience Act because plaintiffs had not and could not allege a substantial burden on their religious beliefs because neither the mandate nor the Conscience Act applied to them.

¶ 8        On April 5, 2021, the trial court granted defendants' motion to dismiss but allowed plaintiffs to file an amended complaint.

¶ 9        On May 3, 2021, plaintiffs filed their first amended complaint and named the Department as the only defendant. Once again, the amended complaint contained counts alleging the mandate violated the IRFRA (count I) and the Conscience Act (count II).

¶ 10        On June 30, 2021, the Department moved to dismiss plaintiffs' Conscience Act claim pursuant to section 2-615 of the Code of Civil Procedure (*id.* § 2-615), arguing the claim in the amended complaint suffered from the same deficiency as the initial complaint because plaintiffs were not " 'health care payers' " entitled to protection under the Conscience Act. On September 21, 2021, the trial court agreed and dismissed plaintiffs' Conscience Act claim with

prejudice.

¶ 11    In March 2023, the trial court granted a motion by Rock River Cartage, Inc., and Curt House to voluntarily dismiss their claim against the Department without prejudice. Then, in January 2024, the court allowed Southland Smiles, Ltd., and Richard Mantoan to voluntarily dismiss their claims without prejudice. As a result, only the Association's claim alleging a violation of the IRFRA remained.

¶ 12    On April 5, 2024, the trial court entered an agreed order, which stated the Association and the Department had "engaged in fact discovery" and agreed the case could "be fully resolved with dispositive motion practice." However, the parties reserved the right to engage in expert discovery if their motions for summary judgment were denied. On May 17, 2024, both the Association and the Department filed motions for summary judgment and later filed responses to each other's motions.

¶ 13    The Department argued the mandate only applied to insurance products it regulated and it did not regulate all the insurance products available to the Association. According to the Department, the mandate did not substantially burden the Association's exercise of its religion. Further, even if the Association could establish the mandate substantially burdened the exercise of its religion, the Department contended the mandate furthered a compelling government interest by allowing equitable access to a medical procedure and was the least restrictive manner of effectuating that compelling interest.

¶ 14    The Department noted the Association had purchased health insurance from GuideStone Financial Resources (GuideStone)—a Southern Baptist entity based in Dallas, Texas, that provides insurance and financial products to Southern Baptist organizations like plaintiff— for approximately 40 years, until 2019. Jeff Deasy, who had been the Association's administrative

- 4 -

director of operations since 2016, testified the Association had purchased health insurance plans without abortion coverage from GuideStone for as long as he could remember prior to 2019. The health insurance products the Association purchased through GuideStone were not subject to the Department's regulations.

¶ 15 In 2018, the Association worked with insurance broker Joseph Samuelson to explore health insurance products not offered by GuideStone. Samuelson only provided the Association with quotes for Illinois health insurance products. In 2019, the Association switched to a Blue Cross Blue Shield of Illinois (BCBS-IL) health insurance plan that was regulated by the Department and was less expensive than the GuideStone health insurance it had been purchasing. Like the GuideStone plan, the BCBS-IL plan excluded abortion coverage when the Association originally purchased it.

¶ 16 The mandate went into effect on June 12, 2019. As a result, because the Association's health insurance policy through BCBS-IL was regulated by the Department, it would include abortion care as of January 1, 2020. During that interim period, the Association asked Samuelson to find a product that excluded abortion care. Samuelson was unable to secure a quote that met the Association's budget. However, Samuelson never attempted to obtain a quote for an out-of-state insurance product to meet the Association's needs. The agency Samuelson worked for did not sell insurance products based outside of Illinois. The Association kept its BCBS-IL plan that covered abortion care for 2020 and 2021.

¶ 17 On November 17, 2021, the Springfield Clinic, which was used for health services by approximately 60% of the Association's employees, was dropped as a preferred provider by the Association's BCBS-IL health insurance plan. As a result, if the Association continued to use the BCBS-IL plan, its employees would either have to change treatment providers or pay higher

out-of-network prices at Springfield Clinic.

¶ 18    The Association wanted to have an insurance option for 2022 where its employees would have in-network coverage at Springfield Clinic. Samuelson provided a quote for a Health Alliance product that was reasonably priced and included Springfield Clinic as an in-network provider, but it included abortion care coverage. The Association contacted GuideStone, who provided a quote for a plan that was comparable in coverage, cost less than the Health Alliance plan, and excluded abortion care coverage. Shortly thereafter, the Association announced to its employees it was going to purchase its insurance for 2022 through GuideStone. However, the Association then learned the GuideStone plan was offered through the Blue Cross Blue Shield network, specifically Blue Cross Blue Shield Highmark, which meant Springfield Clinic would still be an out-of-network provider. The Association did not investigate the possibility another out-of-state company might also offer health insurance plans that did not cover abortion care.

¶ 19    At that point, the Association decided to use the Health Alliance plan that included abortion coverage for its health insurance in 2022 instead of the GuideStone plan that excluded abortion care coverage. As of February 2024, the Association continued to use the Health Alliance plan, even though it included abortion care coverage. The Association had neither obtained additional quotes from GuideStone since 2022 nor looked for other alternative out-of-state insurance products not regulated by the Department.

¶ 20    The Department noted the Association had indicated a willingness to switch to a GuideStone health insurance plan once Springfield Clinic and Blue Cross Blue Shield had resolved their dispute. According to the Department, publicly available information showed Springfield Clinic and Blue Cross Blue Shield had resolved their conflict.

¶ 21    As to the legal merits of the Association's first amended complaint, the Department

argued the Association had the initial statutory duty to demonstrate the abortion mandate substantially burdened its exercise of religion. According to the Department, because a health insurance plan that did not include abortion care coverage had been available to the Association after the abortion care mandate went into effect, the Association could not meet its burden of demonstrating the mandate as applied to it substantially burdened its exercise of religion. According to the Department, the Association prioritized other factors over the exclusion of abortion care coverage when shopping for a health insurance plan.

¶ 22　　　　The Department noted Illinois organizations are not required to purchase health insurance products regulated by the Department and are free to purchase health insurance products regulated by other states. Further, the Department asserted it could not take any enforcement action against an Illinois organization that purchases insurance products the Department does not regulate, like out-of-state insurance products. However, the Department stated the Association's insurance broker never attempted to get a quote for any out-of-state insurance product. When the Association received a quote for an affordable health insurance product without abortion coverage from GuideStone, the company from whom it previously had purchased insurance for 40 years, the Association chose to purchase a health insurance policy through Health Alliance that included abortion care.

¶ 23　　　　Therefore, the Department argued, it was entitled to summary judgment on the Association's IRFRA claim. In the alternative, the Department asserted the State had a compelling interest for the mandate because it decreases inequities resulting from reproductive health care services being covered but not abortion care. Further, the Department asserted the mandate was "the least restrictive means for furthering this interest because it utilizes patients' existing health care network, and the cost for mandating abortion coverage in Department-regulated plans is

negligible for private insurance purchasers."

¶ 24    The Association argued it had demonstrated the mandate imposed a substantial burden on its religious beliefs under the IRFRA, it met redressability requirements, and the mandate could not withstand strict scrutiny. According to the Association, the Department could show no compelling interest for the mandate, which was not narrowly tailored. The Association also argued it satisfied the remaining factors to receive a permanent injunction.

¶ 25    Further, the Association indicated it had provided its employees with health insurance, including reproductive health services—but never abortion coverage—before the mandate, through GuideStone and then BCBS-IL. Starting in 2020, after the mandate went into effect, the Association started providing abortion coverage through its BCBS-IL plan. The Association stated it currently had health insurance through Health Alliance, which included abortion coverage.

¶ 26    After the mandate took effect, the Association indicated it started looking for other insurance options, including exemptions, options, and insurance alternatives. Because the mandate applied to all insurance providers in Illinois, the Association could not find a solution without abortion coverage. The Association asked its insurance broker if it could obtain an exemption from the mandate. The broker indicated he had researched the issue and said it was not possible. At that point, the Association believed the only possible health plans included abortion coverage. Every year after the mandate took effect, the Association indicated it asked its insurance broker if it could get an exemption from the mandate and was always told no. We note the record does not contain the basis for the denial of an exemption.

¶ 27    The Association indicated it still wanted to offer group health insurance plans with pregnancy-related benefits to its employees but did not want to offer abortion coverage that

- 8 -

violated its religious beliefs. According to the Association, it had looked into " 'self-funded' " and/or " 'self-insured' " health insurance options that would not be subject to the mandate. However, it determined it would be cost prohibitive and too risky. In addition, the Association asserted it had looked at other types of insurance plans not subject to the mandate, including level-funded plans and associational health insurance plans. The Association believed it did not qualify for a level-funded plan because of the health of its staff. Further, it believed the risk and financial exposure was too great under that type of plan. It also did not believe it qualified for an " 'associational health insurance plan.' "

¶ 28    The Association acknowledged it had considered a health insurance plan that did not include abortion care through GuideStone after the enactment of the mandate. However, the Association had issues with Guidestone. First, the Association had moved away from Guidestone because an Illinois based plan cost "hundreds of thousands of dollars [less] for similar coverage." Second, in 2019 and 2020, GuideStone would not even provide the Association with a quote because of some of the Association's employees' health. Finally, most recently, the policy through GuideStone did not include Springfield Clinic as an in-network provider.

¶ 29    On September 4, 2024, after a hearing in August 2024, for which the record does not include a transcript, the trial court issued a written order granting the Department's motion for summary judgment. In its order, the court indicated the facts showed the Department only regulates insurance products sold within Illinois, options exist within Illinois that are not subject to Department regulation, and organizations in Illinois can choose an alternative insurance option that is not regulated by the Department. The court noted "a substantial burden on religious exercise is not established when viable, lawful alternatives exist that allow the claimant to avoid the alleged conflict between their religious beliefs and the law." Therefore, according to the court, the

Association had not demonstrated the mandate as applied to them imposed a substantial burden on its religious beliefs. The court stated, "Given the availability of alternative insurance options that exclude abortion coverage, the Association's argument under [the] IRFRA lacks the necessary proof of coercion or compulsion required to sustain [its] claim." Pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), the court found no just reason for delaying either enforcement and/or appeal of its order.

¶ 30          This appeal followed.

¶ 31                                    II. ANALYSIS

¶ 32          The Association argues the trial court erred in granting the Department's motion for summary judgment because the abortion coverage mandate violates the IRFRA. According to the Association:

> "The statute prevents [the Association] from obtaining or purchasing health insurance for itself or its employees unless it pays for abortions (including other people's) and becomes complicit in the provision of elective abortions and abortion-inducing drugs. That imposes a 'substantial burden' [on] Plaintiff's exercise of its religious faith."

The Association also asserts the Department cannot establish the abortion coverage mandate furthers a compelling state interest in the least restrictive manner. Finally, the Association asks this court to remand the case to the trial court with directions to grant the Association's motion for summary judgment.

¶ 33                         A. Procedural Posture of the Appeal

¶ 34          Although this case initially involved multiple plaintiffs and multiple claims, the Association is the only appellant. The Association initially pursued claims pursuant to both the

Conscience Act and the IRFRA. However, the Association only appeals the trial court's order granting the Department's motion for summary judgment on the IRFRA claim.

¶ 35 Further, both the Association and the Department filed motions for summary judgment in the trial court. "When parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. The Association is not asking this court to remand this matter for further proceedings based on the existence of a question of material fact. Instead, it contends it is entitled to summary judgment. We review an order granting summary judgment *de novo*. *Id.* ¶ 30.

¶ 36 Although the Association spends time in its brief discussing its standing to pursue its claim under the IRFRA, the trial court did not rule the Association lacked standing. In addition, the Department does not dispute on appeal the Association had standing to bring its claim against the Department. As a result, we need not address the Association's standing any further.

¶ 37 B. Abortion Coverage Mandate

¶ 38 At issue is a statutory mandate requiring certain health insurance policies regulated by the Department to provide insurance coverage for abortions and prescription drugs used to terminate pregnancy or the possibility of pregnancy. The parties do not dispute this mandate only applies to health insurance policies regulated by the Department.

¶ 39 C. Religious Accommodation

¶ 40 Before addressing the Association's claim the mandate violates its rights under the IRFRA, we will briefly address its argument the General Assembly intended to include a religious accommodation to the mandate in the Act. The Association points to statements made by a state representative and a state senator when the proposed law was being debated in the Illinois House

of Representatives and the Illinois Senate, respectively, as evidence of this intent. The Association points to the following statement by the state representative:

> "For purposes of legislative intent, the language of Senate Bill 25, as amended by House Amendment 1, makes it abundantly clear that the intent of the language in this Bill is to require an insurance company to offer a health care product but not to interfere with the right of the entity purchasing the health care policy to refuse to provide coverage for abortion care."101st Ill. Gen. Assem., House Proceedings, May 28, 2019, at 13 (statements of Representative Cassidy).

The Association notes the state senator made a similar statement. According to the Association, the Department's "abandonment of the legislature's intent is unacceptable from a legal perspective and a general governance standard. The State should be held to its word."

¶ 41 The Association is presenting this court with a question of statutory construction. "The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature." *Rushton v. Department of Corrections*, 2019 IL App (4th) 180206, ¶ 28. The plain and ordinary meaning of a statute is the best indicator of the legislature's intent. *Id.* "When the language of a statute is clear and unambiguous, it should be applied as written without resort to extrinsic aids of construction." *Id.*

¶ 42 The Association neither argues the plain language of the mandate is ambiguous nor contends the Department is not accurately interpreting the plain language of the mandate. As a result, we need not look at anything outside the language of the Reproductive Health Act to determine the legislature's intent. Regardless, considering the specific facts in this particular case and the Department's position, the comments at issue do not clearly indicate the two legislators intended a religious accommodation to apply to the mandate. As the Department makes clear, the

mandate only applies to insurance policies regulated by the Department. It does not require someone with a religious objection to abortion to purchase a health insurance policy regulated by the Department or restrict someone with that religious belief from purchasing an out-of-state insurance policy not regulated by the Department.

¶ 43                                     D. Illinois Religious Freedom Restoration Act

¶ 44           Several of the cases the Association relies on in its attempt to show the mandate in this case imposes a substantial burden on its religious freedom are constitutional free exercise claims. However, the Association is neither making a claim the mandate violates its constitutional rights nor a claim the mandate is not being applied in a neutral manner. Instead, the Association is only arguing it is entitled to summary judgment on its claim the mandate violates the IRFRA.

¶ 45           The Illinois General Assembly passed the IRFRA after the United States Supreme Court, in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), "virtually eliminated the requirement under the First Amendment to the United States Constitution [U.S. Const., amend. I)] that government justify burdens on the exercise of religion imposed by laws neutral toward religion." 775 ILCS 35/10(a)(4) (West 2020). However, the General Assembly recognized neutral laws may still burden the exercise of religion. *Id.* § 10(a)(2).

¶ 46           According to section 15 of the IRFRA (*id.* § 15):

> "Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest."

The IRFRA does not define what constitutes a substantial burden. *Diggs v. Snyder*, 333 Ill. App.

3d 189, 194 (2002). However, "the hallmark of a substantial burden on one's free exercise of religion is the presentation of a coercive choice of either abandoning one's religious convictions or complying with the governmental regulation." *Id.* at 195 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 217-18 (1972)). The plaintiff must demonstrate the governmental action prevents him from engaging in conduct or having a religious experience that his faith mandates. *Id.*

¶ 47                                    E. *Burwell v. Hobby Lobby Stores, Inc.*

¶ 48          The Association relies on the United States Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), to support its claim the mandate violates the IRFRA. According to the Association, in *Hobby Lobby*, the Supreme Court "held that employers cannot be forced by the federal government to provide contraceptive and abortifacient coverage to employees in violation of their religious beliefs."

¶ 49          At issue in *Hobby Lobby* was whether the federal Religious Freedom Restoration Act of 1993 [(42 U.S.C. § 2000bb *et seq.* (2012))] permitted the United States Department of Health and Human Services (HHS) to demand that three closely held for-profit corporations provide health insurance coverage that included methods of contraception that violated the sincerely held religious beliefs of the companies' owners. *Hobby Lobby*, 573 U.S. at 688-90.

¶ 50          As explained by the Supreme Court, the Patient Protection and Affordable Care Act of 2010 (ACA) (42 U.S.C. § 18001 *et seq.* (2012))) "generally requires employers with 50 or more full-time employees to offer 'a group health plan or group health insurance coverage' that provides 'minimum essential coverage.' 26 U.S.C. §§ 5000A(f)(2), 4980H(a), (c)(2) (2012)." *Hobby Lobby*, 573 U.S. at 696. If an employer covered by the ACA fails to provide the required coverage, the employer must pay a substantial price. According to the Court, a covered employer providing group health insurance that does not comply with the ACA's requirements could be required to

pay $100 per day for each affected person. On the other hand, if the covered employer stopped providing health insurance to its employees altogether, the employer would be required to pay a penalty of $2,000 per year for each of its full-time employees if one or more of its full-time employees enrolled in a health insurance policy and qualified for a subsidy on a government-run ACA exchange. *Id.* at 696-97.

¶ 51 The Supreme Court indicated the owners of the businesses at issue each had a sincere belief life begins at conception. *Id.* at 720. As a result, the owners objected for religious reasons to providing health insurance to their employees that covered birth control methods which might result in the destruction of an embryo. *Id.*

¶ 52 The Court offered the following reasoning for why the mandate in that case imposed a substantial burden on the business owners' respective religious beliefs:

> "By requiring the [business owners] and their companies to arrange for such coverage, the HHS mandate demands that they engage in conduct that seriously violates their religious beliefs.
>
> If the [business owners] and their companies do not yield to this demand, the economic consequences will be severe. If the companies continue to offer group health plans that do not cover the contraceptives at issue, they will be taxed $100 per day for each affected individual. 26 U.S.C. § 4980D. For Hobby Lobby, the bill could amount to $1.3 million per day or about $475 million per year; for Conestoga, the assessment could be $90,000 per day or $33 million per year; and for Mardel, it could be $40,000 per day or about $15 million per year. These sums are surely substantial.
>
> It is true that the plaintiffs could avoid these assessments by dropping

insurance coverage altogether and thus forcing their employees to obtain health insurance on one of the exchanges established under ACA. But if at least one of their full-time employees were to qualify for a subsidy on one of the government-run exchanges, this course would also entail substantial economic consequences. The companies could face penalties of $2,000 per employee each year. § 4980H. These penalties would amount to roughly $26 million for Hobby Lobby, $1.8 million for Conestoga, and $800,000 for Mardel." *Id.* at 720.

In other words, these companies apparently had no way to avoid providing contraception that violated their religious beliefs unless they wanted to pay significant taxes or penalties imposed by law.

¶ 53                          F. The Mandate's Effect on the Association

¶ 54         The Association argues the Department is forcing it to do something even more extreme than to have insurance that covers birth control methods which might result in the destruction of an embryo. According to the Association, the mandate at issue here requires the Association to provide insurance coverage for abortions, which is contrary to its religious beliefs. The Association asserts it has never provided its employees with this type of insurance coverage prior to the mandate becoming law. According to the Association, "The Reproductive Health Act has now coerced [it], in violation of its sincerely held religious beliefs, to provide such coverage."

¶ 55         The Department argues the Association cannot demonstrate the mandate substantially burdens its religious beliefs. According to the Department, "[t]he record showed that the Association had the ability to purchase an insurance product after section 4a had gone into effect that did not cover abortion care." However, the Department maintains the Association chose to purchase an insurance policy regulated by the Department that included abortion coverage.

¶ 56 Based on our review of the record in this case, this case is easily distinguishable from the situation in *Hobby Lobby*. In the case *sub judice*, the following factors appear undisputed. First, the Association is not legally required to provide its employees with health insurance. Second, the State will not assess any kind of monetary tax or penalty on the Association if it does not provide abortion insurance coverage to its employees. Third, if the Association decides to provide its employees with health insurance, it is not required by law to purchase a health insurance plan regulated by the Department. In other words, the Association is free to purchase health insurance, either out of state or through a self-funded or level-funded in-state plan, that does not include coverage for abortions without having to pay any kind of penalty or tax to the State.

¶ 57 From the record, it is clear the Association, when it switched its health insurance from BCBS-IL to Health Alliance, could have purchased health insurance from GuideStone for its employees that did not include abortion coverage after the abortion insurance coverage mandate took effect in Illinois. The Association chose not to do so. Instead, it chose to purchase a more expensive health insurance policy through Health Alliance because the Springfield Clinic was an "in-network provider" under that plan. The record does not reflect the State of Illinois or the Department had anything to do with Springfield Clinic not being an "in-network provider" under the health insurance offered by GuideStone.

¶ 58 The Association argues it should not matter whether it could have purchased a policy through GuideStone that did not include abortion coverage. According to the Association:

> "This option is merely an alternative burden: instead of participating in a robust market of insurers as a purchaser of a typical health plan, [the Association] can 'opt' to search far and wide for a plan that eschews abortion and is otherwise feasible, with no guarantee that any such options will exist."

¶ 59    We disagree. This is not a situation where the Association could not find an affordable insurance policy. Based on the facts before us, we need not determine whether the lack of an affordable option could result in a different outcome. Here, while the insurance policy through GuideStone might not have been perfect because, at the time, Springfield Clinic would be deemed out of network, it was affordable and available to the Association. As a result, the mandate, as applied to the Association under the facts of this case, did not create a substantial burden for the Association.

¶ 60    Because we have determined, based on the specific facts before us on appeal, the mandate did not substantially burden the Association's religious beliefs, we need not consider whether the mandate serves a compelling interest and is the least restrictive means of serving the compelling interest. Further, although not essential to our decision based on the facts in this case, we note the record here does not establish whether the GuideStone policy was the only policy the Association could have purchased that did not cover abortion care. It appears the Association and its insurance broker may not have looked for any out-of-state health insurance policies, other than through GuideStone, to potentially meet the Association's needs.

¶ 61                      III. CONCLUSION

¶ 62    For the reasons stated, we affirm the trial court's order granting the Department's motion for summary judgment.

¶ 63    Affirmed.

¶ 64    JUSTICE STEIGMANN, specially concurring:

¶ 65    Although I fully agree with the conclusion reached by my distinguished colleagues in the majority, I write this special concurrence to emphasize—yet again—the illegitimacy of the

court's relying on "legislative history" as a basis to determine what the legislature intended when it passed legislation.

¶ 66      As the majority correctly noted:

"At issue [in this case] is a statutory mandate requiring certain health insurance policies regulated by the Department to provide insurance coverage for abortions and prescription drugs used to terminate pregnancy or the possibility of pregnancy. The parties do not dispute this mandate only applies to health insurance policies regulated by the Department." *Supra* ¶ 38.

¶ 67      The Association claimed that this mandate violates its rights under the IRFRA, and in support of that claim, the Association points to statements made by a state representative and a state senator when the proposed law was being debated in the Illinois House of Representatives and the Illinois State Senate, respectively. Based upon the remarks of these legislators, the Association argued that the Department had abandoned the legislature's intent when passing the IRFRA.

¶ 68      In my opinion, a claim that a statute should be interpreted based upon the remarks of some legislators during the legislative process is completely without merit and should be rejected by the courts accordingly.

¶ 69      I have written about this subject repeatedly, and it appears that every 10 years or so I must reassert my objections.

¶ 70      The first such case was *Town of City of Bloomington v. Bloomington Township*, 233 Ill. App. 3d 724, 735 (1992), in which the issue was whether the trial court erred by sustaining an objection to supposedly expert testimony by the executive director of the Township Officials Association of Illinois concerning the legislative intent of section 1 of the Township Annexation

Act (Ill. Rev. Stat. 1991, ch. 139, ¶ 127). This court concluded in that case that the trial court would have erred had it allowed the director to testify, explaining as follows:

> "Construing legislative enactments is a uniquely judicial function, and legislators and others involved in the legislative process ought not be allowed to testify regarding the meaning of a statute. Accordingly, 'the views of a legislator concerning a statute already enacted are entitled to no more weight than the views of a judge concerning a statute not yet passed.' *Sullivan v. Finkelstein*, 496 U.S. 617, 632 *** (1990) (Scalia, J., concurring in part).
>
> We note that legislators do not make laws by making speeches on the floor of the legislative chamber or by writing memos for committee meetings. They make laws by majority vote on a specifically worded bill that has been read three times before each house and distributed to each legislator. (Ill. Const.1970, art. IV, §§ 8(c), (d).) Neither the disclosed nor undisclosed intent of a legislator or lobbyist becomes *law*; only the bill as it reads when passed becomes law. Allowing tailored court testimony purporting to explain what the legislature *meant* to say is unacceptable and potentially dangerous." (Emphases in original.) *Id.* at 735-36.

¶ 71 Ten years later, I wrote a dissent in *Krohe v. City of Bloomington*, 329 Ill. App. 3d 1133, 1138 (2002) (Steigmann, J., dissenting), in which I stated that the majority opinion was wrong because, among other reasons, "it gives inappropriate weight to the remarks of a single legislator."

¶ 72 In that case, the majority opinion cited extensively the comments made by Senator Laura Kent Donahue regarding the November 1997 legislative debate to override Governor

Edgar's veto of House Bill 1347, which became the act at issue in that case. *Id.* at 1135-38. In my dissenting opinion, I wrote the following:

> "The problem, however, is that the majority—like the trial court—begins and ends its inquiry by focusing solely on the remarks of Senator Donahue. To the extent that such remarks can ever properly be deemed 'legislative history,' I reject the notion that this court can rely on them in construing section 10 of the Act (820 ILCS 320/10 (West 2000)).
>
> As Justice Scalia has written, '[t]he greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators.' *Conroy v. Aniskoff*, 507 U.S. 511, 519 *** (1993) (Scalia, J., concurring)." *Id.* at 1139 (Steigmann, J., dissenting).

¶ 73    In that dissent, I cited the opinion I wrote for this court in *Town of City of Bloomington*, discussed above, and added the following:

> "If the majority is correct in relying upon the comments of an individual legislator, in this case Senator Donahue, as an appropriate source for determining legislative intent, then the majority should address the following questions that its reliance raises: (1) How many senators were present in the Senate when Senator Donahue spoke? (2) How many senators were aware that Senator Donahue placed the definition of 'catastrophic injury' in her statements discussing the bill rather than in the bill's express language? (3) Assuming a given senator was aware, how does anyone know whether that senator agreed with Senator Donahue's remarks? (4) If a given senator heard Senator Donahue's remarks and did not agree with them, does not the majority opinion place a burden on that senator to step forward

and say so, or forever let the remarks of Senator Donahue be cited by the judiciary as 'the will of the Senate?' (5) If this is to be the rule of statutory construction, then how many Illinois legislators are aware that they remain silent at their peril if they disagree with the views of those legislators motivated to speak about the legislation pending before the chamber?

The majority's approach seriously misconstrues the purpose of legislative debate. That purpose ought not to be to provide language either intentionally or inadvertently left out of the bill being considered. Instead, that purpose should be to persuade legislators who might have doubts about a bill to vote for it. And even then, legislative debates should always be conducted with the understanding that courts will have the last word, in determining what the bill means, based upon the *written language contained within the bill*.

This case illustrates the wisdom of the tenet that courts should not consider legislative debates in construing statutes. See *City of Bloomington*, 233 Ill. App. 3d at 736 *** ('[n]either the disclosed nor undisclosed intent of a legislator or lobbyist becomes *law*; only the bill as it reads when passed becomes law' (emphasis in original)). The oral remarks of Senator Donahue show just how easy it would have been for the legislature to have defined 'catastrophic injury' within the text of section 10 of the Act (820 ILCS 320/10 (West 2000))—assuming, of course, that her fellow legislators would have agreed with Senator Donahue if that language actually appeared in House Bill 1347. For example, that bill could have contained the following language: 'For purposes of this section, "catastrophically injured" means a police officer or firefighter who, due to injuries, has been forced to take a

line-of-duty disability.' However, the bill the legislature passed did not include that language, and even though that language might constitute desirable policy, this court is limited to interpreting the statute as it is written." (Emphases in original.) *Id.* at 1139-40 (Steigmann, J., dissenting).

¶ 74     Then, in 2010, I wrote a special concurrence once again asserting the illegitimacy of "legislative history," based upon the remarks of legislators, as a basis to interpret statutes. See *McKinley Foundation at University of Illinois v. Illinois Department of Labor*, 404 Ill. App. 3d 1115, 1127-29 (2010) (Steigmann, J., specially concurring). In that case, which presented another difficult problem of statutory construction, I reaffirmed what I had written in both *Town of City of Bloomington* and *Krohe* and added the following:

"The Illinois House of Representatives has 118 members and the Illinois State Senate has 59. At the third reading of a specific bill in a given chamber, the members of that chamber vote yes or no (or present, if they wish) on that bill as it is proposed in its written form. A given state senator might read a particular bill in one way, while another state senator might interpret it differently. Although some senators might choose to take to the senate floor to announce their particular interpretations of the bill, the problems they hope it will address, or why they believe it should be enacted, experience demonstrates that at any given time on third reading in any legislative chamber, a large percentage of the members of that chamber are paying little attention, if any, to the remarks of their colleagues. They might be consulting among themselves about other legislative or political matters, speaking on the phone, working on their computers, or simply daydreaming. But by engaging in any of these activities, they are not delegating to their colleagues

- 23 -

who choose to speak about the bill the authority to define what it means. Instead, the senators who choose not to speak on the bill are entirely justified in relying upon the words it contains, not the remarks of their colleagues construing those words in whatever fashion they wish.

Another way to look at this issue is to ask this question: Are senators who disagree with the remarks of a particular senator on the third reading of a proposed bill obligated to rise to express that disagreement on the floor of the senate? And in the absence of their doing so, have they forfeited any later claim that the senator who rose to speak about the bill was not the authoritative voice of the senate on the matter? I have yet to encounter anyone, judge or legislator, who believes that such an obligation exists for senators who disagree with the remarks of some of their colleagues at third reading. Yet, if no such obligation exists, then why do we judges continue to view the few voices who speak in the legislative chamber as somehow authoritative on the subject?

Further, what possible legitimacy can there be to viewing the remarks of a few members of the senate at third reading on a particular bill as authoritative and binding on members of the House of Representatives, who later voted on that same bill? Does anyone contend that somehow the views of the senators who spoke at third reading were necessarily going to be communicated to the members of the House of Representatives or repeated by some member of that body? When subjected to this analysis, the whole notion of 'legislative history,' based upon the remarks of individual legislators, is simply nonsensical.

And when we are looking to 'legislative history' for guidance by examining the remarks of the *opponents* to a particular piece of legislation (which the majority does in this case), then 'legislative history' has even less value than nothing. This is because legislators who oppose a particular bill might, intentionally or otherwise, attribute features to it that it does not possess. Giving these legislators the benefit of the doubt, they might legitimately fear that a certain result will ensue if the bill is passed, but many of their colleagues (especially those voting in favor of the bill) might very well disagree. And if they disagree, they are under no obligation to rise to say so, especially if they think they have the votes to pass the bill in the first place. Thus, the absence of rebuttal to the negative assessments of the bill that the majority in this case quotes is, in my judgment, totally without significance." (Emphasis in original.) *Id.* at 1128-29 (Steigmann, J., specially concurring).

¶ 75    I concluded my special concurrence in *McKinley Foundation* with the following observation:

"I realize that (to date) the Supreme Court of Illinois has disagreed with my view of 'legislative history.' See *People v. Collins*, 214 Ill. 2d 206, 214 *** (2005) ('Where statutory language is ambiguous, *** we may consider other extrinsic aids for construction, such as legislative history and transcripts of legislative debates, to resolve the ambiguity[.]'). Nonetheless, I hope that the supreme court might have occasion to reconsider the legitimacy of legislative history based upon the remarks of legislators (perhaps even in this case) and decide that it will no longer give legitimacy to this analysis." *Id.* at 1129 (Steigmann, J., specially concurring).

¶ 76        The Illinois judiciary, like all judiciaries, has a hierarchal structure. That means that the appellate court cannot overrule decisions of the Illinois Supreme Court. But I can—and do—call upon that court to correct obvious errors in Illinois jurisprudence.

¶ 77        As Justice Scalia has compellingly demonstrated, the use of the remarks of legislators as "legislative history" is fundamentally flawed and totally illegitimate. *Conroy*, 507 U.S. at 519 (Scalia, J., concurring). The Illinois Supreme Court owes it to the bench and bar of this state, as well as the citizens of Illinois, to correct Illinois law by banning this pernicious practice.